IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PINNACLE ENTERTAINMENT, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Case No. _____** |
| LAND CLEARANCE FOR REDEVELOPMENT AUTHORITY OF THE CITY OF ST. LOUIS, MISSOURI, a Missouri public body corporate and politic; | ) ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Serve at: 1015 Locust, Suite 1200, St. Louis, Missouri 63101 | ) ) ) ) | |
| PORT AUTHORITY OF THE CITY OF ST. LOUIS, MISSOURI, a Missouri public body; | ) ) ) ) ) | |
| Serve at:  1015 Locust, Suite 1200, St. Louis, Missouri 63101 | ) ) ) ) | |
| ST. LOUIS DEVELOPMENT CORPORATION, a Missouri nonprofit corporation; | ) ) ) ) | |
| Serve at: 1015 Locust, Suite 1200, St. Louis, Missouri 63101 | ) ) ) ) | |
| and the CITY OF ST. LOUIS, a Missouri municipal corporation, | ) ) ) ) | |
| Serve at: City Hall, 1200 Market St. St. Louis, Missouri 63103 | ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

For its Complaint in the above-captioned matter against Defendants Land Clearance for Redevelopment Authority of the City of St. Louis ("LCRA"); Port Authority of the City of St. Louis, Missouri ("Port"); St. Louis Development Corporation ("SLDC"); and the City of St. Louis, Missouri ("City"), Plaintiff Pinnacle Entertainment, Inc. ("Pinnacle") alleges as follows:

### INTRODUCTION

1.      Pinnacle seeks an order requiring Defendants to perform their duties under the Redevelopment Agreement dated April 22, 2004, as amended, between Pinnacle and the LCRA acting for itself and on behalf of the City ("Redevelopment Agreement").  The Redevelopment Agreement requires Defendants to "diligently pursue assurances" from the Missouri Gaming Commission ("MGC") that the MGC will not select for investigation any application that proposes a new casino to be located in St. Louis, Missouri or within 25 miles of the city limits. Instead of seeking such assurances, as the Redevelopment Agreement requires, Defendants are now actively soliciting proposals for a new casino in St. Louis.

2.      Pinnacle is a casino developer whose subsidiaries currently own and operate three casinos in and around St. Louis.  Defendants are the City and three public development bodies affiliated with the City.

3.      Before Pinnacle invested in the St. Louis market, it entered into the Redevelopment Agreement with the City and the LCRA for the development of a new casino on the riverfront in downtown St. Louis.  A copy of the Redevelopment Agreement is attached hereto and incorporated herein by reference as Exhibit 1.  The City's obligation to "diligently pursue" the assurances referenced above runs for a seven-year period beginning November 28, 2007, and thus does not expire until November 28, 2014.  *Id.*  There are only two exceptions to

this obligation:  Pinnacle's proposed companion casino development in south St. Louis County

known as River City Casino ("River City"), and the President Casino aboard the *Admiral*

("President"), located in downtown St. Louis.  The *Admiral* is a passenger vessel permanently

moored on the Mississippi River just three blocks east of Lumière.  It has 678 slots and seven

tables.  That is significantly fewer slots and table games than either Lumière or River City.  It is

not a mixed-use facility.  *Id.*

      4.     The parties' clear intent in entering into the Redevelopment Agreement was to

provide Pinnacle's new properties with a seven-year period in which to establish themselves in

the marketplace before any new casinos came into the market.

      5.     Since entering into the Redevelopment Agreement in April 2004, Pinnacle has

invested more than $900 million in the development and construction of casinos in and near St.

Louis.  The new downtown casino resort, Lumière Place Casino and Hotels ("Lumière"), cost

approximately $507 million to develop and build.  River City located in unincorporated Lemay,

Missouri, cost approximately $375 million to develop and build.  Pinnacle also purchased and

improved the President at a cost of more than $50 million.  In addition to the expenditures on

development of the Lumière, Pinnacle agreed to pay the City an annual services fee of $1 million

which commenced when Pinnacle's River City Casino opened in consideration of the City's

cooperation with the County project and as a means of protecting the City from losses in revenue

when River City opened.

      6.     Pinnacle made the investments in the St. Louis market in reliance on the seven-

year grace period provided for in the Redevelopment Agreement and a similar provision in the

Lease and Development Agreement with St. Louis County, which provided to Pinnacle the

exclusive right to operate any gaming projects in St. Louis County, south of the River Des Peres

(the City/County border) for 25 years.  The City's express obligation to seek assurances that the MGC will not select or process any applications for new casinos in or near St. Louis beyond those proposed by Pinnacle necessarily includes a promise **_not_** to actively solicit or promote the development of any such casinos.  See Exhibit 1.

7.      Defendants have breached the express and implied promises in the Redevelopment Agreement, and the breach is ongoing.  On March 25, 2010, the MGC requested notices of interest from parties interested the new license expected to become available in 2010. Instead of "diligently pursuing assurances" from the MGC that no application would be considered for casinos to be located in or near St. Louis, as the Redevelopment Agreement required them to do for the protection of Pinnacle's new casinos, Defendants did the opposite. On March 29, 2010, Defendants LCRA, Port, and SLDC issued a Request for Proposals ("RFP") seeking "proposals from developers wishing to develop a gaming facility adjacent to the Mississippi River and within the boundaries of the City of St. Louis, Missouri."  The RFP states that the "City is particularly interested in a comprehensive boat-in-a-moat project, in which the excursion gaming boat sits within a constructed basin off the river channel and is connected to other land-based development."  Defendants' solicitation of such a development violates the City's affirmative obligations under the Redevelopment Agreement and puts Pinnacle's $900 million investment at risk.  Not only is the City failing to advocate in favor of Lumière and River City with the MGC, it is seeking a new gaming project of a different magnitude from the President that will compete both for Pinnacle's gaming revenues and for the other revenues generated in the mixed uses operated by Pinnacle at Lumière.  Pinnacle therefore seeks an order enjoining Defendants to seek the required assurances from the MGC and to desist from their solicitation of proposals pursuant to the RFP.  In the alternative, Pinnacle seeks damages for any

4

diminution of the value of its properties that may be caused by Defendants' breach of the Redevelopment Agreement. Pinnacle also seeks its attorney fees and costs pursuant to Section 4.31 of the Redevelopment Agreement.

## PARTIES

8.      Pinnacle is a Delaware corporation with its principal place of business in Nevada. Its corporate headquarters are located at 8918 Spanish Ridge Avenue, Las Vegas, Nevada 89148. Pinnacle is the parent of the entities that own and operate Lumière Place, River City, and the President. The subsidiary entities are not parties to the Redevelopment Agreement. Pinnacle is a citizen of the State of Nevada.

9.      Defendant LCRA is a body corporate and politic and is duly constituted under the Land Clearance for Redevelopment Authority Law, Sections 99.300 – 99.660 of the Revised Statutes of Missouri. LCRA recommends development incentives such as tax abatement, tax-exempt revenue bonds, and eminent domain for commercial, industrial, and residential projects in redevelopment areas approved by the City's Board of Aldermen. Defendant LCRA is a citizen of the State of Missouri.

10.     Defendant Port Authority of the City of St. Louis ("Port") is a public body corporate and politic duly organized and existing pursuant to Chapter 68 of the Revised Statutes of Missouri. The Port's budget is funded primarily by the City of St. Louis. It coordinates with individuals or corporations for initial preparation and negotiation of land and mooring leases for development of property owned by the City within the St. Louis port district; works with the staff of the U.S. Army Corps of Engineers and the U.S. Coast Guard on river related matters within the St. Louis port district; coordinates permits for mooring privileges on St. Louis's improved wharf; and processes lease agreements through the City of St. Louis-Port Authority

Commission, the City's Board of Public Service, and the City's Board of Aldermen.  Defendant Port is a citizen of the State of Missouri.

11.     Defendant SLDC is a nonprofit corporation organized under the laws of the State of Missouri with its principal place of business in St. Louis, Missouri.  It fosters economic development and growth in the City through increased job and business opportunities and expansion of the City's tax base.  Its employees serve as staff support for the City's seven economic development authorities, including the LCRA and the Port.  Defendant SLDC is a citizen of the State of Missouri

12.     Defendant City is a constitutional charter municipal corporation of the State of Missouri.  Defendant City is a citizen of the State of Missouri.

13.     Each of Defendants LCRA, Port, and SLDC has its business offices at 1015 Locust, Suite 1200, St. Louis, Missouri 63101.  Pinnacle is informed and believes and on that basis alleges that the members of the governing boards of all three Defendants are appointed by the Mayor of the City; that the same individual serves as Executive Director of Defendants LCRA, Port, and SLDC; that Defendants LCRA, Port, and SLDC share the same staff employees; that Defendants LCRA, Port, and SLDC issued the RFP with the knowledge and approval of the City and/or in consultation with the City; that all four Defendants were aware of the Redevelopment Agreement and their obligations thereunder at the time the RFP was issued; and that each Defendant is the principal and/or agent of each other Defendant for purposes of the allegations in this Complaint.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332.  The parties hereto are citizens of different states.  Because the value of Pinnacle's investment of

approximately $900 million may be substantially impaired as a result of Defendants' actions, the matter in controversy exceeds $75,000.  This Court has personal jurisdiction over Defendants because Defendants reside and conduct their business primarily in the State of Missouri.

15.     Venue is proper in this district under 28 U.S.C. § 1391(a)(1) and (2).  All Defendants reside in this district and a substantial part of the events or omissions giving rise to Pinnacle's claims occurred in this district.

## FACTUAL BACKGROUND

16.     In May 2002, Mayor Francis Slay advised the MGC that the City needed a first-class gaming facility with a hotel, quality restaurants, and other entertainment attractions to help the City realize the potential for development of the tourism and entertainment industries in downtown St. Louis.  Mayor Slay further advised that the MGC should consider issuing a second license for downtown St. Louis if the President Casino did not submit a plan to provide such a first-class facility with a hotel and other amenities.  Mayor Slay concluded, "In short, we want a first-rate gaming facility with all the amenities that would make it a destination attraction. . . . An underperforming casino with few amenities is not consistent with our vision as an important part of the city."  MGC May 23, 2002 Hrg. Tr.,  p. 58.

17.     Pinnacle is informed and believes and on that basis alleges that Defendants were aware, at all relevant times, that the President might close as a result of poor performance, competition from the Casino Queen in Illinois, and/or competition from a new gaming facility developed in the St. Louis area.  In its annual report to the Missouri General Assembly for fiscal year 2000, the MGC stated that "any new casino development located in the heart of the President's primary market would almost certainly put the struggling but still profitable President out of business."  MGC, Annual Report for FY 2000, p. 5.  The MGC also reported that it had

7

approved a Jefferson County project over a Lemay project because "the Lemay project would result in the eventual closure of the President."  Id. at 33.

18.     In August 2003, Defendants LCRA and SLDC issued a Request for Proposals soliciting proposals for the construction of a gaming facility and mixed-use development on property located along the riverfront in downtown St. Louis.  Pinnacle submitted its proposal in November 2003.  At the same time, Pinnacle submitted its proposal for its south St. Louis County development.

19.     On January 15, 2004, Defendants LCRA and Port determined to pursue Pinnacle's proposal and to negotiate a redevelopment agreement with Pinnacle.

20.     On February 24, 2004, Defendants LCRA and Port approved the Term Sheet between Pinnacle and Defendants had executed preliminary to the execution of a redevelopment agreement.

21.     On March 12, 2004, by Ordinance No. 66243, the Board of Aldermen of Defendant City approved the Term Sheet and authorized Defendant LCRA to negotiate and execute a redevelopment agreement based on the Term Sheet.

22.     As of April 22, 2004, Pinnacle and Defendant LCRA, "for itself and on behalf of" Defendant City, entered into the Redevelopment Agreement.  Section 4.18 of the Redevelopment Agreement provides:

> The City and LCRA shall use their reasonable best efforts to cooperate with the Redeveloper during all phases of licensing for the Project before the MGC including, but not necessarily limited to, the following:
>
> . . .
>
> d.  commencing on the date of this Agreement, the City shall diligently pursue assurances from the MGC that the MGC will not select or process any other riverboat gaming application for investigation which application proposes a gaming project within twenty-five miles of the city limits of St. Louis for a period

8

commencing on the Investigation Date and terminating on the date that is seven years following the initial date of Licensure of the Redeveloper for the Project, provided that such agreement shall not apply to or limit any "Existing Gaming Project" or to the Redeveloper's riverboat gaming application for a gaming project to be located in St. Louis County.

An Existing Gaming Project shall be defined as any gaming project for which the MGC has granted a license at the time of execution of this Agreement for gaming operations or subsequently re-licensed, regardless of any change in licensee or in ownership of licensee, and, except as provided in Section 4.18.d(ii), shall only mean such project at its location as of the date of execution of this Agreement, including:

(i)      any excursion gambling boat authorized by the MGC to replace an excursion gambling boat (including another replacement excursion gambling boat) licensed to operate in any such gaming project; and

(ii)      any MGC authorized change in location of any such gaming project located in the City of St. Louis at the time of execution of this Agreement (involving the original or any subsequent replacement excursion gambling boat); provided that such change in location does not result in the project or excursion gambling boat being located on or around the Mississippi River outside the city limits of the City of St. Louis.

The parties agree that the MGC Agreement shall not apply to Redeveloper's current St. Louis County Pinnacle Gaming Proposal dated on or about November 14, 2003 for a competing gaming project submitted to the County.

23.      The City thus covenants that it shall diligently pursue assurances from the MGC that the MGC will not select or process any other riverboat gaming application for investigation which application proposes a gaming project within twenty-five miles of the city limits of St. Louis for a period commencing on the Investigation Date and terminating on the date that is seven years following the initial date of Licensure of the Redeveloper (Pinnacle) for the Project (Lumiêre), provided that such agreement shall not apply to or limit any "Existing Gaming Project" or to the Redeveloper's riverboat gaming application for a gaming project to be located in St. Louis County (River City).

9

24.     At the time Pinnacle and Defendant LCRA entered into the Redevelopment Agreement, there were nine "Existing Gaming Projects," as that term is defined in the Redevelopment Agreement.  The only one located within the city limits of St. Louis was the President, owned by President Casino-Missouri, Inc. ("PRC-MO"), which at that time was a subsidiary of President Casinos, Inc. (then in bankruptcy).  Accordingly, the City was not required to seek assurances from the MGC that the President would not be permitted to change licensee, relocate, or replace its boat, provided that any such relocation (of either the original or replacement boat) remained within City limits.

25.     Section 4.18 also excluded Pinnacle's St. Louis County project from the provision requiring the City and the LCRA to seek assurances from the MGC.

26.     Accordingly, pursuant to the agreement, Defendant City was bound to seek assurances that there would be no new licenses in St. Louis besides that for Pinnacle's downtown project (which became Lumière), and no new licenses within 25 miles of St. Louis other than Pinnacle's south St. Louis County project (which became River City).

27.     The clear purpose of the affirmative covenants set forth in Section 4.18 of the Redevelopment Agreement was to afford protection to Pinnacle's developments in the St. Louis area from new competition during a seven-year period while they established themselves in the marketplace.  That protection was substantial, because the City's opposition to any proposed new casino in St. Louis, given the City's role in the planning, development, construction, and operation of any new casino within the city limits, would likely be determinative with the MGC. Pinnacle's need for such protection of Section 4.18(d) was understandable, given the magnitude and risk of Pinnacle's investment in the City and its surrounding area, and Pinnacle's need for protection was clearly understood by Defendants.

10

28.     In May 2004, when the City addressed the MGC in support of Pinnacle's license application for the downtown St. Louis project (now Lumière), the City specifically requested from the MGC the assurances set forth in Section 4.18.d of the Redevelopment Agreement:

> The first request we make along with Pinnacle.  This request is that the Commission pass a resolution expressing its intention to refrain from issuing any additional gaming licenses within the twenty-five mile radius of the City of St. Louis limits for a period of seven years after the Pinnacle casino is licensed with the exception of a license for the Pinnacle development in St. Louis County.

MGC May 24, 2004 Hrg. Tr., p. 11.  The Executive Director of the LCRA reiterated the request:

> One of our requests to you is the twenty-five miles for seven years, and we agreed with Pinnacle that we would make that request.  And again, we understand that in previous years that has been the practice of the Gaming Commission to allow new gaming operations to get up and running and be successful.

Id. at 25.  Defendants thus recognized the purpose and validity of their obligation to seek a seven-year bar on new gaming applications in and near St. Louis.

29.     The purpose of Section 4.18(d) was not to preserve any of the "Existing Gaming Projects," including the bankrupt President.  As alleged herein, Defendants recognized there was a substantial risk that the President would close and that licensure of new casino developments in downtown St. Louis and/or south St. Louis County would increase that risk.  Other speakers at the May 2004 hearing stated that the development of a new casino in downtown St. Louis or in south St. Louis County could result in the closure of the President.

30.     In September 2004, the MGC acknowledged that selecting the Pinnacle proposal to build in downtown St. Louis and south St. Louis County would likely result in the closure of the President.  The MGC's Chief Financial Officer testified, "We think if we chose one of the companion projects [note:  Pinnacle and the Isle of Capri each proposed two companion developments], the President will close. . . .  But I would emphasize that in the companion scenarios, we're showing the President will close, notwithstanding a possible change in

11

ownership in any expansion that might occur."  MGC Sept. 1, 2004 Hrg. Tr., pp. 30-31.  One of the commissioners observed, "Obviously what we are faced with today is add two new casinos and lose one, is basically what's going to happen."  Id. at p. 33.  Pinnacle is informed and believes and on that basis alleges that Defendants recognized the risk that the President would close and knew, or through the exercise of reasonable care should have known, of the MGC's analysis of the President's prospects.

31.     The construction of Lumière in downtown St. Louis commenced in approximately September 2005.  Pinnacle was licensed for Lumière by the MGC as of November 28, 2007.  Defendants' obligations pursuant to Section 4.18(d) of the Redevelopment Agreement are therefore effective for seven years from that date until November 28, 2014.  The final cost of developing and building Lumière was approximately $507 million.

32.     The construction of River City in south St. Louis County commenced in approximately November 2005.  Pinnacle was licensed for River City by the MGC on February 24, 2010.  The final cost of developing and building River City was approximately $375 million.

33.     By agreement dated February 24, 2006, Pinnacle purchased PRC-MO from President Casinos, Inc. for approximately $45 million.  The MGC approved the acquisition on November 29, 2006.  Pinnacle thus became the indirect owner of the President, an "Existing Gaming Project" under the Redevelopment Agreement.  The President was relicensed by the MGC under Pinnacle's indirect ownership on November 28, 2007 and December 3, 2008.

34.     After acquiring the President, Pinnacle sought to obtain the MGC's approval to repair or replace the *Admiral*, the aging vessel on which the President is located.  During this time Pinnacle also raised the possibility of relocating the President to a new location within the St. Louis city limits.  As stated above, Section 4.18(d) did not require the City to oppose any of

12

those proposals.  Indeed, the City supported Pinnacle's efforts to repair, replace, or relocate the President.

35.     In August 2009, following an agency hearing, the MGC issued Resolution No. 09-069, in which it rejected the attempts by Pinnacle, or its subsidiary PRC-MO, to repair, replace, or relocate the President.  Pinnacle and PRC-MO vigorously disputed the validity of this Resolution and brought a legal action in the Missouri Court of Appeals seeking to overturn it.  The City moved to intervene in that case, in support of Pinnacle and PRC-MO.

36.     While that legal challenge was pending, in January 2010, the MGC proposed revoking the President's license, citing its economic performance and Pinnacle's alleged downgrade of the President's offerings.  Supported by the City, Pinnacle vigorously opposed the proposed revocation.  By settlement agreement approved March 10, 2010, Pinnacle and PRC-MO agreed to surrender the license to operate the President on or before July 1, 2010.

37.     By notice published on March 25, 2010, the MGC announced that it was requesting "all parties, who have an interest in the riverboat gaming license which will be available in the near future," to provide a written "Notice of Interest" to the MGC by May 1, 2010.  A license is expected to become available as a result of the surrender of the President's license.  A copy of the MGC's March 25, 2010 Notice is attached as Exhibit B to Defendants' RFP, which is attached hereto as Exhibit 2.

38.     Pursuant to Section 4.18(d) of the Redevelopment Agreement, the City should have responded to the MGC's March 25 notice by requesting the MGC for assurances that the MGC would not pursue any application proposing a new casino in St. Louis or within 25 miles of St. Louis, based on the need of continuing protection of Lumiêre and River City from new competition until 2014.  Instead of advocating for the continuing protection of Pinnacle's new

13

casinos, the City began advocating for a new casino within the St. Louis city limits.  On March 29, 2010, Defendants LCRA, Port, and SLDC issued the RFP.

39.     Pinnacle is informed and believes and on that basis alleges that the RFP was issued in consultation, with the knowledge and approval of, and on behalf of, the City.

40.     The RFP states that Defendants LCRA, Port, and SLDC "hereby request proposals from developers wishing to develop a gaming facility adjacent to the Mississippi River and within the boundaries of the City of St. Louis, Missouri."  The RFP further states, "The City of St. Louis plans to respond to the MGC's Notice of Interest due by May 1, 2010."  The RFP further states:  "After the City's submission of its Notice of Interest to the MGC on May 1, 2010, the City plans to select a respondent through the process described in this RFP to submit a quality gaming facility development proposal to the MGC that expands economic development within the boundaries of the City."  See RFP at 1, Ex. 2 hereto.

41.     Defendants' RFP is inconsistent with its duty to advocate for the seven-year grace period provided for in the Redevelopment Agreement for Lumière and River City to establish themselves in the St. Louis market.

42.     Defendants' RFP is a breach of their express and implied obligations under the Redevelopment Agreement and such breach puts at risk Pinnacle's $900 million investment in the St. Louis market.

43.     On April 7, 2010, Defendants held a meeting, open to the public, to answer questions from developers interested in proposing a new casino adjacent to the Mississippi River and within city limits.  The meeting was held in the board room of Defendant SLDC.

14

44.     By holding that meeting, Defendants further breached their express and implied obligations under the Redevelopment Agreement and such breach puts at risk Pinnacle's $900 million investment in the St. Louis market.

45.     The City's request to the MGC in May 2004 – that the MGC pass a resolution expressing its intention not to select any other riverboat gaming application for investigation within 25 miles of the St. Louis city limits for a period of seven years commencing on the date the Lumière would be licensed – confirms that the City understood its continuing obligations under Section 4.18 of the Redevelopment Agreement.  Generally, the home dock city selects an applicant to endorse to the MGC for investigation, and the MGC decides whether to pursue investigation.  Although the MGC has the power to determine unilaterally whether to investigate an applicant for a license in any jurisdiction in Missouri, the MGC typically gives great weight to the preferences of the home dock city.  Accordingly, the continuing obligation of the City to seek assurances from the MGC for a seven-year period remains of significant value to Pinnacle, even if the City did not obtain a resolution from the City in 2004.

46.     By letter dated April 13, 2010, Pinnacle advised Defendant LCRA that Pinnacle regarded the RFP and briefing meeting as a breach of Defendants' obligations under the Redevelopment Agreement and the Gaming Plan.  Pinnacle asked Defendant LCRA to confirm that it would abide by its obligations under the Redevelopment Agreement.

47.     By letter dated April 29, 2010, the LCRA disputed that the RFP breached the Redevelopment Agreement.  The LCRA took the position that the parties "agreed that the City would continue as the home dock city for at least two (2) licensed gaming facilities."

48.     By letter dated May 5, 2010, Pinnacle responded to the LCRA's letter.  The LCRA's position is completely contrary to the language and the purpose of the Redevelopment

15

Agreement.  No language in the Redevelopment Agreement supports the LCRA interpretation. Section 4.18.d requires the City to use its best efforts to protect Pinnacle's new developments from new local competitors for seven years.  It does not permit the City to seek the development of a new local competitor in the event an "Existing Gaming Project" no longer exists.  The City is misconstruing the Redevelopment Agreement in an attempt to leverage the parties' contemplation that an Existing Casino Project might change ownership, relocate, or operate on a replacement boat, into an opportunity to replace an Existing Casino Project – the President – with a "high-quality, financially and operationally successful gaming facility that will attract customers and other visitors to the City and that will develop other uses in the area of or adjacent to the gaming facility."  See RFP, Ex. 2 hereto.  Defendants are attempting to turn Section 4.18(d) into its opposite – from protection for Pinnacle's new St. Louis properties into permission to secure a new gaming competitor, thereby diminishing Pinnacle's substantial investment.  The LCRA has not responded substantively to Pinnacle's May 5 letter.

49.     The LCRA's April 29 response to Pinnacle's April 13 letter and failure to respond to Pinnacle's May 5 letter make clear that Defendants have no intention of curing their default pursuant to Section 4.3(viii) of the Redevelopment Agreement.  Accordingly, Pinnacle seeks by this Complaint an order requiring the City to "diligently pursue" the assurances provided for in Section 4.18(d) and enjoining the solicitation and application process initiated by the RFP.

## COUNT I
## DECLARATORY JUDGMENT
### (All Defendants)

50.     Pinnacle incorporates by reference each and every allegation contained in paragraphs 1 through 49 of this Complaint as if they were fully set forth herein.

16

51.    Plaintiff has an interest in the Redevelopment Agreement which is a contract made pursuant to the laws of the State of Missouri.

52.    Pursuant to the LCRA correspondence of April 29, 2010 there is a dispute between the parties as to the scope and meaning of Section 4.18 of the Redevelopment Agreement.

53.    Entry of an Order determining the party's obligations pursuant to Section 4.18 of the Redevelopment Agreement would terminate the uncertainty or controversy giving rise to these proceedings as provided by Section 2201 of the United States Code.

54.    Pursuant to Section 2201 of the United States Code, this Court is empowered to "declare the rights and other legal relations of any interested party seeking such declaration." Pursuant to Section 2202 of the United States Code, this Court may grant "further necessary or proper relief based on a declaratory judgment." Accordingly, Pinnacle seeks an Order declaring its rights under Section 4.18 of the Redevelopment Agreement and such further relief as is necessary or proper.

## COUNT II
## INJUNCTIVE RELIEF
### (All Defendants)

55.    Pinnacle incorporates by reference each and every allegation contained in paragraphs 1 through 54 of this Complaint as if they were fully set forth herein.

56.    The City's failure to seek assurances that the MGC would not select for investigation any application for a new casino within, or within 25 miles of, the St. Louis city limits; the issuance of the RFP; the subsequent meeting held by Defendants; and any further acts by Defendants to solicit interest in the development of a new casino facility within the city limits

of St. Louis, Missouri (or within 25 miles thereof) prior to November 28, 2014, constitute a breach of Section 4.18.d of the Redevelopment Agreement.

57.    As more fully set forth herein, the value of Pinnacle's $900 million investment will be irreparably harmed if Defendants are allowed to continue their breach of the Redevelopment Agreement.

58.    The RFP has a set a deadline of May 27, 2010, for submission of full proposals by interested parties which requires, the payment of a $10,000.00 non-refundable filing fee to cover the costs of the evaluation process.  If an injunction is not granted promptly, potential respondents to Defendants' unlawful solicitation will likely spend tens of thousands of dollars preparing license applications pursuant to the RFP.  It is in the interest of the public to prevent (1) the waste of resources and (2) Defendants from profiting from their breach of the Redevelopment Agreement.

59.    Damages are not adequate relief because they are difficult to determine and likely to be of a magnitude beyond the ability of any of Defendants, which are all public entities, to pay.

60.    The balance of harms favors Pinnacle because an injunction will enforce the parties' agreement, eliminate uncertainty and protect potential applicants from wasting their resources on an unlawful project, while Defendants will not suffer the loss of any rights.

61.    Accordingly, Pinnacle seeks an order requiring Defendants to diligently pursue assurances from the MGC that the MGC will not select or process any gaming application for a new casino development within 25 miles of the St. Louis city limits at any time before November 28, 2014, and prohibiting Defendants from taking any further action inconsistent with their obligations under Section 4.18.  Further, Defendants should be ordered to advise

18

respondents to the RFP that Pinnacle has objected to the RFP under the Redevelopment Agreement.

## COUNT III
## BREACH OF CONTRACT
### (Defendants LCRA and City)

62.     Pinnacle incorporates by reference each and every allegation contained in paragraphs 1 through 61 of this Complaint as if they were fully set forth herein.

63.     Defendants' actions as more fully set forth in herein constitute a breach of Section 4.18(d) of the Redevelopment Agreement.

64.     Pursuant to Section 4.31 of the Redevelopment Agreement, Plaintiff is entitled to its attorney's fees and cost incurred in enforcing its rights under the Redevelopment Agreement.

65.     Defendants have harmed Pinnacle by depriving Pinnacle of the City's promised advocacy before the MGC and by subjecting Pinnacle's $900 million investment to uncertainty, thereby diminishing the value of the investment.

66.     Defendants' actions further threaten Pinnacle with very significant damages if Defendants' RFP is permitted to proceed.  Pinnacle is therefore entitled to injunctive relief, its attorney's fees and costs incurred in pursuing this action, and damages for the improper diminution in value of its investment.

## COUNT IV
## BREACH OF IMPLIED COVENANT
## OF GOOD FAITH AND FAIR DEALING
### (Defendants LCRA and City)

67     Pinnacle incorporates by reference each and every allegation contained in paragraphs 1 through 66 of this Complaint as if they were fully set forth herein.

68.     Defendants' actions as set forth herein constitute a breach of the implied covenant of good faith and fair dealing in the Redevelopment Agreement.  Defendants' actions evade the

spirit of the Redevelopment Agreement and seek to deny Pinnacle the expected benefits of the agreement.  Defendants have harmed Pinnacle by depriving Pinnacle of the City's promised advocacy before the MGC and by subjecting Pinnacle's $900 million investment to uncertainty, thereby diminishing the value of the investment.  Defendants' actions further threaten Pinnacle with very significant future harm if Defendants' RFP is permitted to proceed.  Pinnacle is therefore entitled to injunctive relief, its attorney's fees and costs incurred in pursuing this action, and damages for the diminution in value of its investment.

### COUNT V
### PROMISSORY ESTOPPEL
### (Defendants LCRA and City)

69.     Pinnacle incorporates by reference each and every allegation contained in paragraphs 1 through 68 of this Complaint as if they were fully set forth herein.

70.     Pinnacle has invested more than $900 million in the St. Louis market in reliance on Defendants' representations and promises, expressed in the proceedings and documentation preceding Pinnacle's construction of Lumière and River City, that Defendants would seek to protect Pinnacle's new developments.

71.     Defendants expected, or should have expected, Pinnacle to rely on those promises.

72.     Defendants have harmed Pinnacle by depriving Pinnacle of the City's promised advocacy before the MGC and by subjecting Pinnacle's $900 million investment to uncertainty, thereby diminishing the value of the investment.  Defendants' actions further threaten Pinnacle with very significant future harm if Defendants' RFP is permitted to proceed.

73.     Enforcing Defendants' promises is necessary to protect Pinnacle's investment. Pinnacle is therefore entitled to injunctive relief and/or damages.

20

74.     Plaintiff hereby requests a jury trial.

WHEREFORE, for the foregoing reasons, Plaintiff Pinnacle Entertainment, Inc. requests the following relief:

1.      a preliminary injunction requiring Defendants to immediately seek assurances from the MGC that it will not select or process any riverboat gaming application that relates to a proposed gaming development within 25 miles of the St. Louis city limits at any time before November 28, 2014; to immediately cease any activity in furtherance of the RFP or contrary to their obligations under Section 4.18 of the Redevelopment Agreement; and to advise all individuals or entities that have responded to the RFP that Defendants will not proceed with the RFP;

2.      a permanent injunction on the same terms.

3.      damages, according to proof;

4.      attorney's fees and costs, pursuant to Section 4.31 of the Redevelopment Agreement;

5.      and such other and further relief as the Court deems just and proper.


Respectfully submitted,

/s/  Scott J. Dickenson
Jerome D. Riffel, Missouri Bar # 22346
Scott J. Dickenson, #497949
10 South Broadway, Suite 1300
St. Louis, Missouri 63102-1708
Telephone:  (314) 613-2500
Telecopier:  (314) 613-2550

STLDOCS 238257v1

Mark J. Briol
William G. Carpenter
Vicki J. Bitner
(pro hac vice applications in preparation)
BRIOL & ASSOCIATES, PLLC
3900 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
(612) 337-8410
(612) 331-5151 (fax)

ATTORNEYS FOR PINNACLE
ENTERTAINMENT, INC.