UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| PINNACLE ENTERTAINMENT, INC., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:10CV00943 AGF |
| | ) | |
| LAND CLEARANCE FOR | ) | |
| REDEVELOPMENT AUTHORITY OF | ) | |
| THE CITY OF ST. LOUIS, MISSOURI; | ) | |
| PORT AUTHORITY OF THE CITY OF ST. | ) | |
| LOUIS; ST. LOUIS REDEVELOPMENT | ) | |
| CORPORATION; and CITY OF ST. LOUIS, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This diversity breach-of-contract case is before the Court on the motion of Plaintiff Pinnacle Entertainment, Inc. ("Pinnacle") for a preliminary injunction. Pinnacle, a publically traded company, is the parent of the entities that own and operate the "Lumière" gambling project in the City of St. Louis. Defendants are the Land Clearance for Redevelopment Authority of the City of St. Louis, Missouri; the Port Authority of the City of St. Louis; the St. Louis Redevelopment Corporation; and the City of St. Louis (hereinafter jointly referred to as "the City").

Pinnacle seeks (1) to enjoin the City from soliciting, reviewing, selecting, and/or endorsing proposals before the Missouri Gaming Commission ("MGC") for another

gambling casino within the City, and (2) to require the City to comply with its obligations under Section 4.18(d) of the Redevelopment Agreement ("RDA") entered into between the parties on April 22, 2004. An evidentiary hearing was held on the motion on July 7 and 8, 2010. Upon review of the entire record, including the parties' post-hearing briefs, and for the reasons set forth below, the motion for a preliminary injunction shall be denied.

## BACKGROUND

The parties' joint stipulation of facts (Doc. #47) sets forth many of the background facts pertaining to the present dispute. To give context to the present dispute, the Court will highlight and add certain relevant facts.

In 1994, the President Riverboat Casino-Missouri, Inc. ("President Casino") opened a casino on the riverfront in the City of St. Louis, becoming the first casino to be licenced in the State of Missouri by the MGC. But by 2002, the owner of the President Casino had filed for bankruptcy, and the City began the process of seeking another gaming project. At that time, state law did not provide an upper limit on the number of excursion gambling boat casinos[1] that could be authorized, and the City sought a "first-rate gaming facility with all amenities." Pinnacle submitted a proposal that the City elected to pursue, and the parties began to negotiate an agreement. In February 2004, the

---

[1] The terms "riverboat" and "excursion gambling boat" are terms of art and refer to any facility licensed by the MGC on which gambling is allowed. See Mo. Rev. Stats. §§ 313.800(8), 313.807.

- 2 -

City submitted a Gaming Development Plan, with an attached "Term Sheet," to the MGC.

The Plan stated as follows:

> I. RECOMMENDED NUMBER OF LICENSES
>
> The policy of the City of St. Louis is to recommend to the [MGC] to limit the number of gaming licenses in the City to any license(s) currently existing at the time of the adoption of this plan and one additional license, with an emphasis on attracting the highest quality operations.
>
> The City may determine a need to reassess its policy regarding number of City gaming licenses after a seven (7) year period to determine whether conditions warrant an amendment of this policy and recommendation of any additional licenses.

When the City submitted the Gaming Development Plan, the only existing gaming license in the City belonged to the President Casino.

The Term Sheet described the gaming project that Pinnacle, as "Redeveloper," promised to develop in the City, and the parties' obligations. Section 12 stated:

> The City shall cooperate with [Pinnacle] during all phases of licensing before the MGC including . . .
>
> \* \* \*
>
> d. . . . the City shall diligently pursue a resolution by the MGC in connection with the Redeveloper's application and selection for investigation ("MGC Resolution") that the MGC will not select or process any other riverboat gaming application for investigation which application proposes a project within twenty-five (25) miles of the Project Area for a period commencing upon the date that the MGC selects the Redeveloper and the Project for investigation and terminating on the date that is seven (7) years following the initial date of licensure of the Redeveloper for the Project.
>
> The parties agree that the provisions of this Section do not and will not apply to:

    i. Licensed projects in existence at the time of execution of
the Redevelopment Agreement. For purposes of the
Redevelopment Agreement, existing licensed projects shall
include, but not be limited to, the replacement of existing
excursion gambling boat [sic] and/or a change in ownership
of existing licensed projects . . .

On March 12, 2004, through Ordinance 66243, the City authorized execution of an RDA with Pinnacle that would be based on the provisions of the Term Sheet. As noted above, the RDA was entered into on April 22, 2004. Section 4.18 of the RDA provides as follows:

**4.18 Gaming Related Licensing**

  The City and LCRA shall use their reasonable best efforts to cooperate with the Redeveloper during all phases of licensing for the Project before the MGC including, but not necessarily limited to, the following:

  a. the City shall amend its gaming development plan on file with the MGC to conform to the Project;

  b. the City shall sponsor and recommend to the MGC the selection of Redeveloper for investigation and licensing for the Project located in the City on terms and conditions set forth in this Agreement;

  c. the parties hereby agree that design changes and regulatory requirements dictated by MGC or other legal or governmental authorities shall be accepted by the parties and implemented by Redeveloper using its reasonable best efforts and shall not be considered material modifications to the Project unless said changes or requirements have the effect in quantity and/or quality of reducing any of the Essential Elements;

  d. commencing on the date of this Agreement, the City shall diligently pursue assurances from the MGC that MGC will not select or process any other riverboat gaming application for investigation which application proposes a gaming project within twenty-five miles of the city limits of St. Louis for a period commencing on the Investigation Date and

terminating on the date that is seven years following the initial date of Licensure of the Redeveloper for the Project, provided that such agreement shall not apply to or limit any "Existing Gaming Project" or to the Redeveloper's riverboat gaming application for a gaming project to be located in St. Louis County.

An Existing Gaming Project shall be defined as any gaming project for which the MGC has granted a license at the time of execution of this Agreement for gaming operations or subsequently re-licensed, regardless of any change in licensee or in ownership of licensee, and, except as provided in Section 4.18.d(ii), shall only mean such project at its location as of the date of execution of this Agreement, including:

(i) any excursion gambling boat authorized by the MGC to replace an excursion gambling boat (including another replacement excursion gambling boat) licensed to operate any such gaming project; and

(ii) any MGC authorized change in location of any such gaming project located in the City of St. Louis at the time of execution of this Agreement (involving the original or any subsequent replacement excursion gambling boat); provided that such change in location does not result in the project or excursion gambling boat being located on or around the Mississippi River outside of the city limits of the City of St. Louis.

The parties agree that the MGC Agreement shall not apply to Redeveloper's current St. Louis Pinnacle Gaming Proposal dated on or about November 14, 2003 for a competing gaming project submitted to the County.

Section 4.1(v) of the RDA gave Pinnacle the right to terminate the RDA if the MGC did not give "assurances satisfactory in the sole discretion of [Pinnacle] pursuant to Section 4.18(d) . . . ." Section 4.23 provides that the RDA is to be governed by Missouri law.

It is undisputed that in May 2004, in connection with Pinnacle's license application for what became the Lumière project, the City did indeed request from the

MGC the assurances at issue, set forth in Section 4.18(d), namely, that the MGC not select or process any other gaming projects within the specified geographical area for seven years after Lumière's licensure. The MGC did not grant or otherwise respond to the City's request for the assurances at issue, but Pinnacle did not exercise its option to terminate the RDA. It is undisputed that until the onset of the present dispute with the City, Pinnacle has never asserted that any further conduct to seek assurances was required of the City.

In 2006, after a proposal by another entity to acquire the President Casino failed, Pinnacle acquired the President Casino out of bankruptcy. On November 28, 2007, Pinnacle obtained its licensure for the Lumière, thereby becoming the owner of both gaming licenses in the City.

In 2008, Missouri adopted a statute limiting the number of gaming licenses in the state. Mo. Rev. Stat. § 313.780. The statute provides that the MGC

> shall not authorize additional . . . gambling . . . licenses after November 4, 2008, that exceed the number of licenses which have been approved for [gambling projects] already built and those under construction. . . . If one or more . . . licenses issued . . . is forfeited, surrendered, revoked, not renewed, or expires then the [MGC] may issue a new license to replace the license that was forfeited, surrendered, revoked, not renewed, or expired.

At the time, there were 13 approved licenses in the state, including the President Casino's and Lumière's.

In March 2010, following certain challenges by the MGC and the threat of revocation of the President Casino license, Pinnacle entered into an agreement with the

MGC pursuant to which Pinnacle agreed to surrender the President Casino's gaming license as of July 1, 2010.

On March 29, 2010, the City issued a Request for Proposals from developers wishing to develop a "quality gaming facility" in the City adjacent to the Mississippi River, so that the City could select a developer and submit a proposal to the MGC for the one and last available gaming license in the state.

Pinnacle filed this action on May 25, 2010, for injunctive relief ordering the City to honor its obligations under Section 4.18(d) and to cease from soliciting proposals for a new casino within the City. The complaint also seeks declaratory relief and damages for breach of contract.

By resolution dated May 26, 2010, the MGC stated that it determined, in anticipation of the surrender of the President Casino's license and pursuant to the MGC's authority to "issue a new license to replace the license that was surrendered," that "such license should be reissued" at the earliest possible time. The resolution provided that MGC would be accepting applications for the 13th license from June 1 through September 1, 2010.

On June 9, 2010, Pinnacle filed the present motion for a preliminary injunction seeking an order requiring the City to honor its obligations under Section 4.18(d) and to cease from soliciting proposals for a new casino within the City.

## DISCUSSION

### Preliminary Injunction Standard

"The primary function of a preliminary injunction is to preserve the status quo until, upon final hearing, a court may grant full, effective relief." Kansas City So. Trans. Co., Inc. v. Teamsters Local Union # 41, 126 F.3d 1059, 1066 (8th Cir. 1997) (citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 374 (2008). In the Eighth Circuit, these four factors are known as the "Dataphase" factors, based upon the 1981 en banc case, Dataphase Sys., Inc. v. C L Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981).

In each case, the factors must be balanced to determine whether they tilt toward or away from granting injunctive relief. West Pub. Co. v. Mead Data Cent., Inc., 799 F.2d 1219, 1222 (8th Cir. 1986). Without a finding of irreparable injury to the moving party, however, a preliminary injunction should not be issued. Modern Computer Sys., Inc. v. Modern Banking Sys., Inc., 871 F.2d 734, 738 (8th Cir. 1989) (en banc). The party requesting injunctive relief bears the "complete burden" of proving that an injunction should be granted. Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987).

### Likelihood of Success on the Merits

The first factor requires that Pinnacle establish that it is "likely to succeed on the

merits" of its breach of contract claim.  Winter, 129 S. Ct. at 374.  Pinnacle asks this Court to apply the "fair chance to succeed" test rather than the more rigorous "likely to succeed" test.  But this Court believes that it is bound by the Supreme Court's recent formulation of the test, in Winter, as "likely to succeed."[2]

To determine Pinnacle's likelihood of success on the merits, the Court turns to the contract provision at issue, Section 4.18 of the RDA.  Under Missouri law, "[t]he cardinal principle of contract interpretation is to ascertain the intention of the parties and to give effect to that intent."  Dunn Indus. Group, Inc. v. City of Sugar Creek, 112 S.W.3d 421, 428 (Mo. 2003) (citation omitted).  In construing contractual provisions, a court "is to avoid an interpretation that renders other provisions meaningless.  It is preferable to attribute a reasonable meaning to each clause and harmonize all provisions, rather than leave some provisions non-functional or nonsensical."  Nodaway Valley Bank v. E.L. Crawford Constr., Inc., 126 S.W.3d 820, 827 (Mo. Ct. App. 2004) (citations omitted).

---

[2] In Planned Parenthood Minnesota, North Dakota, South Dakota v. Rounds, 530 F.3d 724, 731-32 (8th Cir. 2008), decided several months before Winter, the Eighth Circuit held that the "likely to prevail" test should only be applied "in a case . . . where a preliminary injunction is sought to enjoin the implementation of a duly enacted state statute," and that in all other cases, district courts should apply the "fair chance of prevailing" test. 530 F.3d at 772.  In a footnote, the Court explained that the "likely to prevail" test would also apply to preliminary injunctions sought to enjoin enforcement of federal statutes, and "city ordinances or administrative actions by federal, state or local government agencies . . . to the extent the challenged action represents 'the full play of the democratic process.'"  Id. n.6 (citing Able v. United States, 44 F.3d 128 (2d Cir. 1995)).  The Court does not believe it needs to determine whether the City's challenged action represents "the full play of the democratic process," because Winter applied the "likely to prevail" standard in a non-government situation.

Missouri law further provides that the intent of the parties "is to be determined based upon the contract alone and not based on extrinsic or parol evidence unless the contract is ambiguous." Sonoma Mgmt. Co. v. Boessen, 70 S.W.3d 475, 479 (Mo. Ct. App. 2002). Whether the language of a contract is ambiguous is a question of law. CIT Group/Sales Fin., Inc. v. Lark, 906 S.W.2d 865, 868 (Mo. Ct. App. 1995). "A contract is not ambiguous merely because the parties disagree over its meaning." Id. Rather, "[d]isputed language is ambiguous if an average person would find it reasonably susceptible of more than one meaning." U.S. Neurosurgical, Inc. v. Midwest Div.-RMC, LLC, 303 S.W.3d 660, 665 (Mo. Ct. App. 2010). "[T]o determine whether a contract is ambiguous, the court must "consider the whole document and give the words their natural and ordinary meaning." Angoff v. Mersman, 917 S.W.2d 207, 210 (Mo. Ct. App. 1996) (citation omitted). "Where an ambiguity is found, the resolution of the ambiguity is a question of fact for the [fact finder] to determine using extrinsic evidence." U.S. Neurosurgical, Inc., 303 S.W.3d at 665.

Here, the parties' disagreement centers on the duration of the City's obligation to "diligently pursue assurances from the MGC . . . ," as well as the scope of the obligation. With respect to duration, the City argues that its obligation was limited to the initial licensing process, ending when Lumière was licenced. Pinnacle does not argue that the City failed to meet its obligation during the initial licensing process. Pinnacle contends, however, that the City's obligation was ongoing throughout the entire period of Lumière's licencing and re-licensing, with the obligation terminating of its own force

seven years from the date of Lumière's initial licensure. Pinnacle bases this reading on the phrase "during all phases of licensing," which, according to Pinnacle, encompasses the renewal licenses Pinnacle was required to obtain from the MGC every two years. Pinnacle also argues that under the City's interpretation, the phrase, "commencing on the date of this Agreement" would be superfluous, "because there would be no need to identify a separate time period from the licensing period."

With respect to the scope of the obligation, the City posits that the exception for "any 'Existing Gaming Project'" permits the City to advocate for two gaming projects within the City, regardless of any changes in ownership, facilities, or location of a project. The City points to Section 4.18(d)(i), which includes in the definition of "Existing Gaming Project," any gambling facility "authorized by the MGC to replace" a licensed facility.

Pinnacle maintains that the "Existing Gaming Project" exception only applies to a project that would use the same license as the President Casino and not to a project that would require a "new" license, as, according to Pinnacle, any second facility in the City would now require due to the surrender of the President Casino's license.

After a careful reading of the pertinent terms of the RDA and the RDA as a whole, and consideration of the parties' arguments and briefs, the Court concludes that an average person would find the relevant contract provision reasonably susceptible to more

than one meaning.[3]  As such, the Court believes that the relevant contract provision is ambiguous, permitting consideration of extrinsic evidence to ascertain the intent of the parties.  The extrinsic evidence that is now before the Court strongly supports the City's positions as to the duration and scope of the City's obligation at issue.

Rodney Crim, who participated in the negotiation of the RDA on behalf of the City as the Executive Director of the City's Land Clearance Redevelopment Authority and the other Defendant agencies, testified at the hearing that he understood that the City's obligation to "pursue assurances" ended on the date that Lumière received its initial license.  This interpretation of Section 4.18(d) is further supported by the above-quoted language of the Term Sheet, which is a part of the Ordinance that authorized the City to enter into the RDA.  Both the Ordinance and the Term Sheet are referenced in the RDA.  That language specifically states that the City shall pursue such resolution by the MGC "in connection with the Redeveloper's application and selection for investigation."  The Court rejects Pinnacle's contention that this construction renders superfluous the phrase in Section 4.18(d), "commencing on the date of this Agreement."  Rather, this particular language makes plain that the City would begin to seek such assurance immediately.

With regard to the scope of the provision, Mr. Crim testified that the City, which

---

[3] If not ambiguous, the Court finds that Pinnacle has not established that it is likely to succeed on the merits, and that the City's contention as to the meaning of the contract provision, especially with regard to the duration, is more persuasive.

knew that the President Casino was in bankruptcy, negotiated the "Existing Gaming Project" exemption to ensure that the City could continue to have two gaming projects within the City, regardless of any changes in ownership, facilities, or location of a second facility. Again, this testimony is supported by the above-quoted language of the Term Sheet, which specifies that "Licensed projects in existence at the time of execution of the Redevelopment Agreement . . . shall include, but not be limited to, the replacement of existing excursion gambling boat and/or a change in ownership of existing licensed projects." Pinnacle did not offer any contrary or competing testimony or evidence.

In sum, based upon the record before it at this stage of the proceedings, the Court cannot conclude that Pinnacle has met its burden of showing that it is likely to succeed on the merits of its breach of contract claim.

**The Likelihood that Pinnacle Will Suffer Irreparable Harm Absent a Preliminary Injunction**

A preliminary injunction will not be issued simply to prevent the possibility of some remote future injury. <u>O'Shea v. Littleton</u>, 414 U.S. 488, 502 (1974) (cited with approval in <u>Winter</u>, 129 S. Ct. at 375). As the Supreme Court stated in <u>Winter</u>, "[i]ssuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." 129 S. Ct. at 375. Thus, a plaintiff seeking preliminary relief must "demonstrate that irreparable injury is likely in the absence of an injunction." <u>Id.</u>

- 13 -

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." Gen. Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 319 (8th Cir. 2009); see also CDI Energy Servs v. West River Pumps, Inc., 567 F.3d 398, 403 (8th Cir. 2009) (citation omitted) (explaining that preliminary injunctive relief is not available where a plaintiff has "an adequate remedy at law, namely, the damages and other relief to which [it] will be entitled if [it] prevails" in the case).

Here, the Court does not believe that Pinnacle has shown that it is likely to suffer irreparable harm in the absence of a preliminary injunction. First, the threat of any harm to Pinnacle is speculative. Even if the City decides to submit a proposal to the MGC for a second gaming project in the City, Pinnacle failed to make any showing as to the likelihood that the MGC would choose that proposal for licensure. "Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time." Packard Elevator v. I.C.C., 782 F.2d 112, 115 (8th Cir. 1986) (citations omitted).

Furthermore, Pinnacle has not established that if indeed the MGC were to choose a proposal by the City, Pinnacle would not have an adequate remedy at law for any damages it might suffer. At the hearing, Carlos Ruisanchez, Pinnacle's Executive Vice President of Strategic Planning and Development, testified that at this point in time, Pinnacle's damages in the form of lost profits that would result if the 13th licence were awarded for another project in the City, were hard to ascertain. According to Mr. Ruisanchez, this is because very little is known now regarding matters such as the size,

location, and design of any such project. He repeatedly acknowledged, however, that as more and more of such facts become known, Pinnacle's lost profits would be quantifiable with a higher and higher degree of certainty.

Under Missouri law, future lost profits may be recoverable when they are shown to have been the natural and probable consequences of an act or omission of the defendant and they are "shown by reasonable certainty." Ozark Employment Specialists, Inc. v. Beeman, 80 S.W.3d 882, 897 (Mo. Ct. App. 2002). While this may pose challenges at the time of trial, the Court cannot conclude, based on the evidence presented, that Pinnacle would not have an adequate remedy at law. See Midwest Theatres Corp v. IMAX Corp., No. 08-5823 (DSD/SRN), 2008 WL 4832598, at *2 (D. Minn. Nov. 3, 2008) (holding that operator of movie theater was not entitled to a preliminary injunction restraining a competitor from constructing a new theater, because the operator failed to demonstrate irreparable harm; the new theater was in its early stages and thus did not threaten immediate harm; "Moreover, even if the theater's opening was imminent, any damages suffered by [the operator of the existing theater] as a result could be adequately addressed through monetary damages").

At the hearing, Pinnacle also asserted that it would suffer irreparable harm as a result of the negative impact that the denial of a preliminary injunction would have on the value of its stock and its reputation in the industry. But Pinnacle's evidence on these

issues was so vague and general as to be entitled to little, if any, weight.[4]  In sum, Pinnacle has not met its burden to show the threat of irreparable harm.  Absent such a showing, the Court could deny injunctive relief on this ground alone.  See Modern Computer, 871 F.2d at 738.

**The Balance of Harms**

Even if Pinnacle were to establish that it is threatened with irreparable harm, this harm would have to be balanced against the harm that the City would suffer if the preliminary injunction were granted.  See Winter, 129 S. Ct. at 376 ("In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.") (citation omitted).  The Court finds that the potential harm to the City outweighs the threat of harm to Pinnacle.  The City presented evidence that it will lose approximately $2 million in tax revenue, over 200 jobs, and approximately $9 million in payroll as a result of the closure of the President Casino.  If the Court were to issue the preliminary injunction, the City will be foreclosed from even seeking the 13th license.  Pinnacle's argument that the City will suffer no harm, because it "will not be barred from supporting a new casino after November 28,

---

[4]  In addition to Mr. Ruisanchez's generalized statement of possible and unquantified impact, Pinnacle offered general statements from James Deutsch, an attorney with extensive experience in gaming law in Missouri.  While Mr. Deutsch may well qualify as an expert on certain aspects of gaming law and MGC practices, Pinnacle did not establish that he has the necessary background and experience to opine as to the impact in the financial market of the pendency of this litigation or the prospect of a second casino gaming project to replace the President Casino.

- 16 -

2014" has little if any merit. Due to the 2008 adoption of Mo. Rev. Stat. § 313.780, no additional licenses will be available absent a change in the law or the abandonment or termination of the license of a current gaming operation. And if enjoined at this early stage, it is difficult to see how the City could ever establish its damages should it prevail on the merits.

As stated above, if the Court were not to issue the preliminary injunction, the harm Pinnacle fears, i.e., a second competing facility in the City, might still not come about. Moreover, Pinnacle's own representatives have stated and testified that the impact on the Lumière casino would depend upon the type and location of any new gaming operation; it might draw from the two casinos located on the other side of the Mississippi River, more than from the Lumière. As such, the balance of the harms factor weighs against granting an injunction.

**The Public Interest**

On the record before the Court, and as is often the case, the public interest does not strongly weigh in favor of either party.[5]

## CONCLUSION

Based upon a balancing of the four Dataphase factors, this Court determines that a

---

[5] The City also argued and presented substantial evidence in support of an assertion that Pinnacle should be barred from obtaining equitable relief due to unclean hands, based on Pinnacle's alleged actions in furthering the deterioration of the President Casino. In light of this Court's Order, however, it is unnecessary for the Court to address this issue at this point in the proceedings.

preliminary injunction is not warranted.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for a Preliminary Injunction is **DENIED**. [Doc. #12]

**IT IS FURTHER ORDERED** that Defendants' motion to strike the affidavit and testimony of Carlos Ruisanchez is **DENIED**. [Doc. #38]

**IT IS FURTHER ORDERED** that Defendants' motion to strike the expert affidavit and testimony of James B. Deutsch is **DENIED**. [Doc. #40]

**IT IS FURTHER ORDERED** that Defendants' motion to strike portions of the affidavit and testimony of Todd George is **DENIED**. [Doc. #42]

**IT IS FURTHER ORDERED** that Defendants' motion to exclude the testimony of Plaintiff's counsel Jerome D. Riffel is **DENIED** as moot. [Doc. #44]

**IT IS FURTHER ORDERED** that Plaintiff's motion to exclude the testimony of the Missouri Gaming Commission is **DENIED**. [Doc. #55]

**IT IS FURTHER ORDERED** that Defendants shall have ten days from the date of this Order to file an answer.

*Audrey G. Fleissig*
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 15th day of July, 2010.